

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**ENTERED**
**07/06/2010**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 09-34988-H4-13** |
| **JOHN DANIEL JACOBSON and** | § | |
| **MARLENE KAY JACOBSON,** | § | |
| | § | |
| **Debtors.** | § | |
| | § | |

| | | |
|---|---|---|
| **REBECCA BERGER,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | |
| | § | |
| **JOHN DANIEL JACOBSON,** | § | |
| **Defendant.** | § | **Adversary No. 09-03423** |
| | § | |
| | § | |
| | § | |

# MEMORANDUM OPINION ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT
[Adv. Docket No. 10]

## I. INTRODUCTION

A debtor's ex-wife spent fifteen years seeking to clarify and obtain the exact property interests awarded to her in a final decree of divorce. Shortly after a ruling in her favor by the Fourteenth Court of Appeals of Texas, John D. Jacobson (the Debtor) filed a petition for relief in this Court. The Debtor's ex-wife, Rebecca Berger, asserts that the debt—which she estimates is approximately $1.2 million—should not be discharged, because he committed defalcation by breaching a fiduciary duty owed to her; specifically, she asserts that the Debtor failed to segregate and protect funds that might have been—and ultimately were—adjudicated to belong to her. The Debtor argues that Ms. Berger's reading of the Bankruptcy Code is too broad, and

that his actions do not rise to the level statutorily required to be excepted from discharge. After considering the Debtor's motion for summary judgment, Ms. Berger's response in opposition thereto, the evidence associated with these pleadings, and the applicable law, the Court concludes that the Debtor's conduct does not constitute defalcation; and therefore, the debt owed by the Debtor to Ms. Berger should not be excepted from discharge under a theory of defalcation. Thus, the Court will grant summary judgment to the Debtor on this particular issue. However, because Ms. Berger's complaint has also pleaded that the Debtor's debt to her is nondischargeable because he allegedly committed larceny or embezzlement, and because the Debtor's summary judgment motion fails to address these two issues, the Court will schedule a status conference to discuss a schedule for adjudicating these remaining points.

The Court makes the following Findings of Fact and Conclusions of Law under Federal Rule of Bankruptcy Procedure 7052.[1] To the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such. To the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such. The Court reserves the right to make any additional Findings and Conclusions as may be necessary or as requested by any party.

## II. FINDINGS OF FACT

### A.     The divorce and ensuing litigation.

1.     On November 12, 1993, the 308th Judicial District Court of Harris County Texas (the Family Court) signed a Final Decree of Divorce (the Divorce Decree) in cause number 1993-

---

[1]  Reference to a "Bankruptcy Rule" refers to the Federal Rules of Bankruptcy Procedure. Any reference herein to "the Code" refers to the United States Bankruptcy Code. Further, reference to any section (*i.e.* §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code. Reference to a "Rule" refers to the Federal Rules of Civil Procedure.

06210, granting a divorce to Ms. Berger and the Debtor (the Parties).  [Docket No. 17, Stip. No. 3].[2]

2.      Under the heading "Division of Marital Estate," the Divorce Decree awarded Ms. Berger "[o]ne-half of all oil and gas interests of the parties as described in Exhibit A."  [Docket No. 13, Jnt. Ex. 1, p. 27].  Exhibit A of the Divorce Decree lists certain oil and gas wells (the Original Wells).  [Docket No. 17, Stip. No. 4].

3.      A protracted and bitter dispute arose over the exact property interests awarded in the Divorce Decree, as detailed below.  The Parties have now been in court for no less than seventeen years.

4.      Before the entry of the Divorce Decree, the Debtor instructed his employer, Texas Independent Exploration (TIE), the operator, to place fifty percent (50%) of the joint interest billing and the revenue in the Original Wells in Ms. Berger's name and account.  [Docket No. 17, Stip. No. 5].

5.      At the time of entry of the Divorce Decree, the Debtor owned certain leasehold interests associated with the Original Wells, and Ms. Berger was aware of this fact.  [Docket No. 17, Stip. No. 6].

6.      After entry of the Divorce Decree, the Debtor acquired ownership interest in several additional wells (the Additional Wells) *which arose from his leasehold interests in the Original Wells identified in the Divorce Decree.*  [Docket No. 17, Stips. No. 7–8] (emphasis added).[3]  It is unclear from the evidence exactly when the Debtor acquired ownership interest in the Additional Wells.

---

[2]  Unless otherwise noted, all docket numbers refer to this adversary proceeding, which is adversary number 09-03423.
[3]  For a more detailed discussion of the various interests awarded the Parties in the Divorce Decree and the specific rights arising from those interests, see the decision of the Fourteenth Court of Appeals of Texas, styled *Broesche v. Jacobson*, 218 S.W.3d 267 (Tex. App.—Houston [14th Dist.] 2007, pet. denied)—discussed in Finding of Fact number 18.  It should be noted that Ms. Berger was Ms. Broesche during a significant portion of these proceedings.

7.      From the date of entry of the Divorce Decree through the Debtor's petition date, the Debtor earned revenues as a result of his ownership interests in the Additional Wells. [Docket No. 17, Stip. No. 10]. The Debtor exercised dominion and control over the revenues he earned as a result of his ownership interests in the Additional Wells. [Docket No. 17, Stip. No. 11]. The Debtor has not transferred any portion of the ownership interests in the Additional Wells to Ms. Berger [Docket No. 17, Stip. No. 12], nor has the Debtor paid Ms. Berger any portion of the revenues he earned as a result of his ownership interests in the Additional Wells [Docket No. 17, Stip. No. 13].

8.      On August 27, 1996, Ms. Berger filed a Motion for Enforcement and Clarification of Decree of Divorce in the Family Court. [Docket No. 17, Stip. No. 15]; [Docket No. 13, Jnt. Ex. 3]. Ms. Berger sought a clarifying order regarding the transfer of her interest in the Original Wells identified in the Divorce Decree. [Docket No. 13, Jnt. Ex. 3]. On October 23, 1996, the Family Court entered an Order on Motion for Clarification of Decree of Divorce. [Docket No. 17, Stip. No. 16]; [Docket No. 13, Jnt. Ex. 4]. The Family Court ordered the Debtor to deliver to Ms. Berger "any and all duly and properly executed assignments necessary to transfer into the name of [Ms. Berger], her interest in and to the oil and gas working interests and revenue interests in the specific wells described in Exhibit 'A' to the [Divorce Decree]." [Docket No. 13, Jnt. Ex. 4].

9.      On October 8, 1997, Ms. Berger filed a First Supplemental Motion for Enforcement in the Family Court. [Docket No. 17, Stip. No. 17]; [Docket No. 13, Jnt. Ex. 5]. Ms. Berger requested the Family Court, *inter alia*, to appoint an auditor to oversee her interest in the Original Wells, place TIE in receivership, and enter clarifying orders regarding TIE and the Debtor's duties. [Docket No. 13, Jnt. Ex. 5].

**B.      The Family Court's Final Decree on Issues of Post-Divorce Enforcement, Clarification and Partition.**

10.      On April 24, 1998, Ms. Berger filed a First Supplemental Petition for Enforcement and for Damages Against TIE. [Docket No. 17, Stip. No. 18], [Docket No. 13, Jnt. Ex. 6], which she amended on November 17, 1998 (the First Amended Petition) [Docket No. 17, Stip. No. 19], [Docket No. 13, Jnt. Ex. 7].  Ms. Berger brought multiple claims against TIE and the Debtor, alleging, *inter alia*, that they fraudulently deprived her of her "interest and income from the mineral interests."  [Docket No. 13, Jnt. Ex. 7, p. 4].  She additionally asserted that she is "entitled to a pro-rata share in all subsequent wells developed from those interests which were not properly partitioned at the time of the divorce" (a reference to revenue from the Additional Wells).  [Docket No. 13, Jnt. Ex. 7, p. 5].

11.      Importantly, in her fraud allegations, Ms. Berger's filing alleged "[the Debtor] and TIE were constructive trustees of [Ms. Berger's] income from the mineral interests and as such had a fiduciary relationship with [Ms. Berger]."  [Docket No. 13, Jnt. Ex. 7, p. 4].

12.      On June 23, 2000, the Family Court signed a Final Decree on Issues of Post-Divorce Enforcement, Clarification and Partition (the Final Decree).  [Docket No. 17, Stip. No. 20]; [Docket No. 13, Jnt. Ex. 8].  The Final Decree reflects that a jury found that the Debtor did not "fail to deliver to [Ms. Berger] . . . any and all duly and properly executed assignments necessary to transfer into the name of [Ms. Berger] her interest in and to the oil and gas working interests and revenue interests . . . in [the Original Wells]." [Docket No. 13, Jnt. Ex. 8, Question No. 2].  The jury also found that the Debtor did not "fail to comply with the terms of the [Divorce Decree] that awards to [Ms. Berger] one-half of all oil and gas interests of the parties as described in Exhibit A." [Docket No. 13, Jnt. Ex. 8, Question No. 3].  However, the jury found

that the Debtor had committed fraud against Ms. Berger and awarded her $157,234.48 in damages and fees. [Docket No. 13, Jnt. Ex. 8, Questions Nos. 5–7, 9a].

13.     Importantly, the jury's finding of fraud related only to the Original Wells, as opposed to the Additional Wells.  The Parties stipulate that the dispute at issue in this adversary proceeding does not involve revenues either party may have received from the Original Wells—this adversary proceeding is solely related to revenues from the Additional Wells.  [Docket No. 17, Stip. No. 14].  Finally, the jury finding was set aside by the Family Court as noted *infra*.

## C.      The Family Court's Final Judgment.

13.     On September 6, 2000, the Family Court signed an Order on John D. Jacobson's Motion for New Trial and Motion to Modify Judgment and Rebecca L. Broesche's[4] Motion for Partial New Trial.  [Docket No. 17, Stip. No. 21]; [Docket No. 13, Jnt. Ex. 9].  The order granted a new trial and set aside the findings of the June 23, 2000 Final Decree.  [Docket No. 13, Jnt. Ex. 9].

14.     After the Family Court's decision to grant a new trial, Ms. Berger amended her petition for enforcement and damages at least three times.  On December 6, 2002, Ms. Berger filed a Third[5] Amended Supplemental Petition for Enforcement and for Damages Against Texas Independent Exploration, Inc.  [Docket No. 17, Stip. No. 22]; [Docket No. 13, Jnt. Ex. 10].  A fourth supplement was filed on December 30, 2002 [Docket No. 17, Stip. No. 23]; [Docket No. 13, Jnt. Ex. 11] and a fifth on February 3, 2003 [Docket No. 17, Stip. No. 24]; [Docket No. 13, Jnt. Ex. 12].  In her filings, Ms. Berger asserted many of the same claims against the Debtor and TIE as in the First Amended Petition, among them breach of contract, conversion, fraud, an action to quiet title, and alternative pleadings for post divorce partition and clarification.  [Docket No. 13, Jnt. Ex. 12].

---

[4] It should be recalled that Ms. Berger was Ms. Broesche during a significant portion of these proceedings.
[5] Although it is logical that Ms. Berger at some point filed a *Second* Amended Supplemental Petition for Enforcement and for Damages Against TIE, no such filing was submitted to the Court by either party.

15.     On February 24, 2004, the Family Court entered a Final Judgment on the matter.  [Docket No. 17, Stip. No. 25]; [Docket No. 13, Jnt. Ex. 13].  In its Final Judgment, the Family Court denied Ms. Berger's request for a declaration that the Divorce Decree awarded Ms. Berger a fifty percent (50%) interest in leasehold interests pertaining to the Original Wells.  [Docket No. 13, Jnt. Ex. 13, ¶ 9].  Had Ms. Berger been awarded the leasehold interests in the Original Wells, she would have been able to participate in and receive revenues from the Additional Wells—the revenues in the dispute at bar.  [Docket No. 13, Jnt. Ex. 7, pp. 2–3].

16.     On May 18, 2004, the Family Court entered Findings of Fact and Conclusions of Law on 02/24/04 Final Judgment.  [Docket No. 17, Stip. No. 26]; [Docket No. 13, Jnt. Ex. 14].  Ruling for the Debtor's interpretation of the Divorce Decree, the Family Court concluded that the disputed section of the Divorce Decree was not ambiguous.  [Docket No. 13, Jnt. Ex. 14, Finding of Fact No. 86, Conclusion of Law No. 3].  The Family Court also found—again in the Debtor's favor—that Exhibit A of the Divorce Decree described working and net royalty interests in only the fifty specific wells listed in the exhibit (*i.e.* in only the Original Wells).  [Docket No. 13, Jnt. Ex. 14, Finding of Fact No. 88].  Finally, the Family Court found that Exhibit A did not describe or award to Ms. Berger any real property ownership, ownership in leases, or a leasehold interest relating to those specific wells (effectively ruling that Ms. Berger should not have any interest in the Additional Wells).  [Docket No. 13, Jnt. Ex. 14, Finding of Fact No. 88].

**D.      The Fourteenth Court of Appeals' Opinion.**

17.     On May 24, 2004, Ms. Berger filed a Notice of Appeal of February 24, 2004 "Final Judgment" and Incidental Sanctions Orders Dated June 17, 2003 and February 24, 2004.  [Docket No. 17, Stip. No. 27]; [Docket No. 13, Jnt. Ex. 15].

18.     On March 8, 2007, the Fourteenth Court of Appeals issued an Opinion on the matter. [Docket No. 17, Stip. No. 28]; [Docket No. 13, Jnt. Ex. 16].  In the opinion—styled *Broesche v. Jacobson*, 218 S.W.3d 267 (Tex. App.—Houston [14th Dist.] 2007, pet. denied)—the Court of Appeals concluded that both Ms. Berger's and the Debtor's interpretations of the phrase "[o]ne-half of all oil and gas interests of the parties as described in Exhibit A" were reasonable and therefore the decree was ambiguous.  [Docket No. 13, Jnt. Ex. 16, pp. 6–7]; *Broesche*, 218 S.W.3d at 273.  The court reversed the Family Court's judgment and remanded for further fact-finding.  [Docket No. 13, Jnt. Ex. 16, p. 15]; *Broesche*, 218 S.W.3d at 279.

19.     On April 29, 2008, a jury, on remand, returned its verdict in the Family Court.  [Docket No. 17, Stip. No. 30]; [Docket No. 13, Jnt. Ex. 18].  The jury found that the Divorce Decree awarded Ms. Berger a leasehold interest in addition to an interest in the specific wells listed on Exhibit A (*i.e.* in addition to the Original Wells).  [Docket No. 13, Jnt. Ex. 18, p. 8].[6]  This ruling effectively held that Ms. Berger was awarded a leasehold interest in the Original Wells, which would have allowed her to participate in and derive revenues from the Additional Wells.

20.     Subsequent to the jury's verdict on the Debtor's liability, the Family Court began hearing testimony and accepting evidence regarding Ms. Berger's claim for damages.  [Docket No. 17, Stip. No. 31].  It is unclear from the evidence when the hearings began.

---

[6]  The jury answered "Yes" to the only question posed, which read: "Do you find from a preponderance of the evidence that it was the intention of the divorce decree to award to [Ms. Berger] a leasehold interest in addition to an interest in the specific wells listed on Exhibit A?  Do not consider interest that may have been acquired by either party subsequent to the divorce."  [Docket No. 18, Jnt. Ex. 13, p. 7].

**E.     The Debtor's bankruptcy filing.**

21.     On July 10, 2009, the Debtor and his wife filed for relief under Chapter 13.  [Docket No. 17, Stip. No. 32].  The Debtor filed his bankruptcy petition at some point after the Family Court began hearing testimony and accepting evidence relating to Ms. Berger's damage claim and prior to the conclusion of the damages portion of the case.  [Docket No. 17, Stip. No. 33].

22.     In his Schedule F, the Debtor scheduled Ms. Berger as a general unsecured creditor with an unliquidated amount.  [Docket No. 17, Stip. No. 34]; [Main Case No. 09-34988, Docket No. 12, Sch. F, p. 34].

23.     On October 25, 2009, Ms. Berger filed proof of claim number 24-1.  [Docket No. 17, Stip. No. 35]; [Main Case No. 09-34988, Claim No. 24-1].  Ms. Berger claims to be owed the amount of $1,201,427.40.  [Main Case No. 09-34988, Claim No. 24-1].  Ms. Berger does not separate out the revenue produced by the Additional Wells after April 29, 2008—the date of the jury's finding that the Divorce Decree awarded her a leasehold interest in the Original Wells (and correspondingly an interest in the Additional Wells)—from the revenue generated by the Additional Wells prior to April 29, 2008.

**F.     Ms. Berger's arguments.**

24.     On October 26, 2009, Ms. Berger filed a complaint against the Debtor in this Court, initiating adversary number 09-03423.  [Docket No. 1].  In her pleading, Ms. Berger alleges that the Debtor received—and withheld from her—funds that were ultimately hers as a matter of law.  [Docket No. 1, ¶ 7–8].  Ms. Berger asserts that the Debtor's actual receipt of "property awarded to the owner in a decree of divorce . . . creates a fiduciary obligation in favor of the owner and imposes a constructive trust on the property for the benefit of the owner."  [Docket No. 1, ¶ 10].[7]

---

7 In addition to asserting that the Debtor committed defalcation while acting in a fiduciary capacity, in the alternative, Ms. Berger avers that the Debtor committed embezzlement or larceny.  [Docket No. 1, ¶ 12].

25.    Specifically, Ms. Berger alleges that the Debtor's failure to remit to her $491,000.00 in revenues from the Additional Wells constitutes a breach of the Debtor's fiduciary duties, and she concludes that the debt owed to her is non-dischargeable, as the Debtor's actions constitute "defalcation" under § 523(a)(4).  [Docket No. 1, ¶ 10].  Ms. Berger also cites to this Court's decision in *In re Presto*, 376 B.R. 554, (Bankr. S.D. Tex. 2007) in support of her argument, as well as several opinions from the Fifth Circuit.  [Docket No. 1, ¶ 10]; [Docket No. 14, ¶¶ 4, 14]. Finally, Ms. Berger seeks $700,000.00 in attorneys' fees.  [Docket No. 1, ¶ 11].

26.    Ms. Berger relies heavily on Tex. Fam. Code Ann. § 9.011(b).  The statute, as well as her conclusion that the Debtor has a fiduciary duty while holding the funds in a constructive trust, is referenced numerous times in her various pleadings.  *E.g.* [Docket No. 13, Jnt. Ex. 6, p. 3] ("[the Debtor] and TIE were constructive trustees of [Ms. Berger's] wells and as such had a fiduciary relationship with [Ms. Berger]"); [Docket No. 13, Jnt. Ex. 7, p. 4] ("[the Debtor] and TIE were constructive trustees of [Ms. Berger's] income from the mineral interests and as such had a fiduciary relationship with [Ms. Berger]"); [Docket No. 13, Jnt. Ex. 12, p. 9] ("[the Debtor] and TIE were constructive trustees of [Ms. Berger's] income from the mineral interests and as such had a fiduciary relationship with [Ms. Berger]"); [Docket No. 1, ¶ 10] ("The Texas Family Code . . . creates a fiduciary obligation in favor of the owner and imposes a constructive trust on the property for the benefit of the owner").

### G.    The Debtor's arguments.

27.    The Debtor primarily argues two points.  First, the Debtor maintains that the parties were involved in a legal dispute for fifteen years over the exact meaning of the Divorce Decree, which the Fourteenth Court of Appeals itself held to be ambiguous.  [Docket No. 10, ¶¶ 1–18].  The Debtor avers that it was not until the jury's verdict in April 29, 2008 that the leasehold interests

in the Original Wells—which gave rise to an interest in the Additional Wells—were awarded to her; therefore, no fiduciary duty arose until that point. [Docket No. 10, ¶ 18]. The Debtor therefore argues that, as the Decree itself was ambiguous, he did not have knowledge of exactly which assets and revenues to turn over to Ms. Berger. [Docket No. 10, p. 15]. The Debtor also argues that a reasonable person, looking at the terms of the Divorce Decree, would reasonably believe that the Divorce Decree awards Ms. Berger only a fifty percent (50%) interest in the Original Wells. [Docket No. 18, ¶ 3]. The Debtor asserts that this argument is supported by the Family Court's 2004 Final Judgment in his favor, and the Fourteenth Court of Appeals' 2007 Opinion holding that his interpretation was reasonable. [Docket No. 18, ¶ 3]. The Debtor further argues that the facts of *Presto* differ significantly from those here, insofar as the ex-husband's duties were crystal clear in *Presto*, whereas the ex-husband's duties were held to be ambiguous in the case at bar. [Docket No. 18, ¶¶ 9–12].

28.     Second, assuming this Court concludes that the Debtor owed Ms. Berger a fiduciary duty under Tex. Fam. Code Ann. § 9.011(b), the Debtor argues that the type of trust and fiduciary relationship created by Tex. Fam. Code Ann. § 9.011(b) is insufficient to rise to the level required for defalcation under § 523(a)(4). [Docket No. 18, ¶ 6].

### III. CONCLUSIONS OF LAW

**A.  Jurisdiction and Venue**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This particular dispute is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (I), and the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157

if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that an "[a]dversary [p]roceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance"). Venue is proper pursuant to 28 U.S.C. § 1409.

## B. Review of Fifth Circuit case law on defalcation.

Bankruptcy law favors discharge of a debtor's debts to afford him a fresh start, but with several exceptions. *Tex. Lottery Comm'n v. Tran (In re Tran)*, 151 F.3d 339, 342 (5th Cir. 1998). Section 523(a)(4) excepts from discharge "an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). While defalcation is not defined in the Bankruptcy Code, defalcation is broadly characterized as an abuse of a fiduciary position. *Boyle v. Abilene Lumber (In re Boyle)*, 819 F.2d 583, 588 (5th Cir. 1987).

i.  The trust created by Tex. Fam. Code Ann. § 9.011(b) does not suffice for purposes of the defalcation exception to discharge.

The Fifth Circuit has held that the threshold issues for a debt to be rendered non-dischargeable due to defalcation are: (1) the presence of a definable *res*, (2) the imposition of trust-like duties, and (3) the trust's existence prior to any claimed misappropriation:

> Consistent with the principle that exceptions to discharge are to be narrowly construed, the concept of fiduciary under § 523(a)(4) is narrower than it is under the general common law. Under § 523(a)(4), "fiduciary" is limited to instances involving express or technical trusts. The purported trustee's duties must, therefore, arise independent of any contractual obligation. The trustee's obligations, moreover, must have been imposed prior to, rather than by virtue of, any claimed misappropriation or wrong. *Constructive trusts or trusts ex malificio thus also fall short of the requirements of § 523(a)(4).*

Statutory trusts, by contrast, can satisfy the dictates of § 523(a)(4). *It is not enough, however, that a statute purports to create a trust: A [statute] cannot magically transform ordinary agents, contractors, or sellers into fiduciaries by the simple incantation of the terms "trust" or "fiduciary." Rather, to meet the requirements of § 523(a)(4), a statutory trust must (1) include a definable res and (2) impose "trust-like" duties.*

*Tran*, 151 F.3d at 342–43 (emphasis added) (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, (1934) (B. Cardozo, J.)); *accord Bennett v. Bennett (In re Bennett)*, 989 F.2d 779, 784 (5th Cir. 1993). In *Tran*, the Fifth Circuit also noted that the concept of a fiduciary under § 523(a)(4) is a question of federal law, but state law is important in determining "whether the supposed fiduciary relationship possesses the attributes required under § 523(a)(4)." *Id.* at 343.

Accordingly, this Court looks to Tex. Fam. Code Ann. §§ 9.011 and 9.012 (the Family Code), which provides that:

Section 9.011—Right to Future Property

* * *

(b)     The subsequent actual receipt by the non-owning party of property awarded to the owner in a decree of divorce or annulment creates a fiduciary obligation in favor of the owner and *imposes a constructive trust* on the property for the benefit of the owner.

Section 9.012—Contempt

* * *

(b)     The court may not enforce by contempt an award in a decree of divorce or annulment of a sum of money payable in a lump sum or in future installment payments in the nature of debt, except for:

(1)     a sum of money in existence at the time the decree was rendered; or

(2)     a matured right to future payments as provided by Section 9.011.

Tex. Fam. Code Ann. §§ 9.011 and 9.012 (emphasis added). Facially, the cited statute is insufficient to create the requisite trust for purposes of defalcation, as § 9.011(b) explicitly

13

defines the trust as a constructive trust. As noted in *Tran* and *Bennett* above, a constructive trust is an insufficient trust for the defalcation exception to discharge. *Tran*, 151 F.3d at 342–43; *Bennett*, 989 F.2d at 784. Ms. Berger judicially admits that the trust created is a constructive trust. [Findings of Fact No. 11, 24, 26]. Therefore, this Court concludes that the trust and fiduciary duties created by the Family Code fail to satisfy the threshold test for defalcation.

A review of the facts in *Tran* underscores why this Court arrives at this conclusion. In *Tran*, a grocer failed to remit to the Texas Lottery Commission (the Commission) proceeds from lottery ticket sales. *Tran*, 151 F.3d at 341. The Texas Lottery Act (the Act)[8] provided that proceeds from lottery ticket sales "shall be held in trust for the benefit of the state." *Id.* at 343. Further, the Commission's administrative rules provided: "[a]ll proceeds from the sale of lottery tickets received by a retailer shall constitute a trust fund until paid to the Texas Lottery . . . . A retailer shall have a fiduciary duty to preserve and account for lottery proceeds." *Id.* (quoting 16 Tex. Admin. Code § 401.351). The Commission's rules also imposed specified bookkeeping requirements on ticket sales agents. *Id.*[9] However, the Act did not require ticket sales agents to segregate the proceeds of lottery funds from general funds, nor were sales agents prohibited from spending lottery proceeds on unrelated items. *Id.* at 341.

The Fifth Circuit held that the Commission's defalcation claim failed to satisfy the threshold test—that of establishing a "true fiduciary relationship"—as the Act failed to: (1) impose an express prohibition on spending trust funds for non-trust purposes, (2) impose an

---

[8] Tex. Gov't Code Ann. §§ 466.011 – 466.409 (Supp. 1998).

[9] "The rules, for example, require a sales agent: (1) to file with the Commission reports of the agent's lottery receipts and transactions; (2) sell lottery tickets on a cash basis; (3) restrict sales to those made in-person, to persons who are eighteen years or older and not affiliated with the Commission; (4) make sales only at prescribed locations; (5) pay lottery prizes not exceeding $600.00; (6) provide reasonable security measures for the sale and storage of tickets; (7) and keep on the premises accurate and complete records of all transactions with the Commission." *Tran*, 151 F.3d at 343 n.20 (citing 16 Tex. Admin. Code Ann. §§ 401.351 – 401.363).

express requirement to segregate such funds, and (3) entrust the ticket sales agent with the state's money for safekeeping or otherwise grant him a position of ascendency over the state. *Id.* at 345.

The same can be said of the Family Code. While the Family Code provides that a fiduciary obligation is created in favor of the owner, the Family Code neither imposes an express prohibition on spending trust funds for non-trust purposes, nor does it contain an express requirement to segregate such funds. Tex. Fam. Code Ann. §§ 9.011 and 9.012. The Family Code does not place the Debtor in a position of ascendency over Ms. Berger. Indeed, the plain language of the Texas Lottery Act is much stronger than the language of the Family Code, yet the Fifth Circuit held in *Tran* that the statutory trust created by the Texas Lottery Act was insufficient for a discharge exemption through defalcation. *Tran*, 151 F.3d at 345. Application of *Tran* therefore leads this Court to conclude that Ms. Berger cannot satisfy the threshold test required of any plaintiff seeking to prevent discharge through a showing of defalcation under § 523(a)(4). Specifically, in the dispute at bar, whatever trust position the Debtor has held does not rise to the level of an express or technical trust that the Fifth Circuit requires for obtaining a judgment of non-dischargeability under § 523(a)(4) for defalcation.

Other Fifth Circuit decisions—cited in *Tran*—support such a conclusion. In *Boyle v. Abilene Lumber (In re Boyle)*, 819 F.2d 583 (5th Cir. 1987), the Fifth Circuit held that the Texas Construction Trust Fund Statute[10] did not make all persons accepting funds or loans under a construction contract a fiduciary, as the statute did not "prohibit a fund holder from paying . . . creditors on one project with surplus funds left over from earlier work and then using funds provided for that later project on still other work." *Boyle*, 819 F.2d at 585–86; *Tran*, 151 F.3d at 343–44. The absence of an express prohibition from spending trust funds for non-trust purposes brought about a similar result in *Coburn Company of Beaumont v. Nicholas (In re Nicholas)*, 956

---

[10]   3 Tex. Prop. Code. Ann. §§ 162.001 – 162.033.

F.2d 110 (5th Cir. 1992) (cited in *Tran*, 151 F.3d at 344 n.28).  Conversely, the statute at issue in *Carey Lumber Co. v. Bell*, 615 F.2d 370 (5th Cir. 1980) expressly prohibited a trustee from spending trust funds for non-trust purposes.  *Tran*, 151 F.3d at 344 n.29.[11]  The *Carey Lumber* court is apparently the only instance where the Fifth Circuit has concluded that a state statute created a sufficient trust for purposes of the defalcation exception to discharge.  *Id.*

As the Family Code does not expressly prohibit the expenditure of the ex-spouse's subsequently acquired funds, the constructive trust does not rise to the level required by clear Fifth Circuit precedent for the Debtor's debt to Ms. Berger to be excepted from discharge for defalcation.

     ii.    <u>The Debtor's conduct does not constitute willful neglect—the requisite *mens rea* for defalcation.</u>

Even if Ms. Berger's claim did not fail the threshold test of establishing an express trust, this Court further concludes that the Debtor's conduct does not constitute willful neglect.  The Circuit courts are split on a debtor's requisite mental state for defalcation.  Andrea Johnson, *The Defalcation Exception to Discharge: Should a Fiduciary's Mistake Prohibit a Discharge from Debt?*, 27 W. New Eng. L. Rev. 93, 96 (2005) (noting that: (1) "the Fourth, Eighth, Ninth, and Tenth [Circuits] do not require any specific intent or motive on behalf of the debtor"; (2) the Fifth and Seventh Circuits "require a standard similar to recklessness, that of willful neglect"; and (3) the First Circuit holds that "defalcation requires some degree of fault, closer to fraud, without the necessity of meeting a strict specific intent requirement.").

---

[11] The statutes in question were the Oklahoma Lien Trust Statutes, 42 Okla. Stat. §§ 152 and 153, which provided: "[t]he monies received under any mortgage given for the purpose of construction or remodeling any structure shall upon receipt by the mortgagor be held as trust funds . . . .  Such trust funds shall be applied to the payment of said valid lienable claims and no portion thereof shall be used for any other purpose until all lienable claims due and owing shall have been paid."

A series of Fifth Circuit cases have defined defalcation as "a *willful* neglect of duty, even if not accompanied by fraud or embezzlement." *Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 182 (5th Cir. 1997) (emphasis added); *accord Office of Thrift Supervision v. Felt (In re Felt)*, 255 F.3d 220, 226 (5th Cir. 2001) ("[t]he defalcation determination turns on the issue of whether [the debtor's] breaches were 'willful.'"); *Bennett v. Bennett (In re Bennett)*, 989 F.2d 779, 784 (5th Cir. 1993); *In re Moreno*, 892 F.2d 417, 421 (5th Cir. 1990) (citing *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Cir. 1937) (L. Hand, J.)).  In *Schwager*, the Fifth Circuit defined "willful neglect" as a recklessness standard, holding that "[w]hile defalcation may not require actual intent, it does require some level of mental culpability.  It is clear in the Fifth Circuit that a 'willful neglect' of fiduciary duty constitutes a defalcation— essentially a recklessness standard." *Schwager*, 121 F.3d at 185 (citing *United States v. Boyle*, 469 U.S. 241, 245 (1985); *Smith v. Wade*, 461 U.S. 30, 39 n. 8, (1983)); *accord Felt*, 255 F.3d at 226.  The Fifth Circuit's language in *Schwager* leaves no doubt that a creditor seeking to establish defalcation under § 523(a)(4) must show that the Debtor's conduct was reckless:

> [I]t appears clear from usage in other contexts that it is essentially a recklessness standard. *See, e.g., United States v. Boyle*, 469 U.S. 241, 245, 83 L. Ed. 2d 622, 105 S. Ct. 687 (1985) (defining "willful neglect" in the statute regarding the penalty for late filing of estate tax returns as "a conscious, intentional failure or reckless indifference"); *Smith v. Wade*, 461 U.S. 30, 39 n.8, 75 L. Ed. 2d 632, 103 S. Ct. 1625 (1983) (defining "willful neglect" in the tort context as "that degree of neglect arising where there is a reckless indifference to the safety of human life, or an intentional failure to perform a manifest duty to the public, in the performance of which the public and the party injured has an interest."

*Schwager*, 121 F.3d 177, 185 n.12.  The Fifth Circuit in *Schwager* also explained that a negligence standard does not suffice for defalcation. *Id.*

In the dispute at bar, the Debtor argues that he acted reasonably.  [Finding of Fact No. 27].  The Family Court not only held that the Debtor's interpretation was reasonable, but that his

interpretation was correct and Ms. Berger's incorrect. [Findings of Fact No. 15–16]. From 1993 until 2008, the Debtor operated under the belief—backed by several decisions of the Family Court—that his interpretation of the Divorce Decree was legally correct. [Findings of Fact No. 12, 15–16]. In the Family Court's 2000 Final Decree, the jury found that the Debtor did not fail to deliver to Ms. Berger any assignments necessary to transfer to Ms. Berger her working interests and revenue interests in the Original Wells. [Finding of Fact No. 12]. In 2004, the Family Court concluded that the Divorce Decree was not ambiguous and that the terms of the Divorce Decree did not award Ms. Berger any real property or leasehold interests in any wells. [Findings of Fact No. 15–16].[12] It was not until 2008—almost fifteen years after the entry of the Divorce Decree—that a jury, on remand from the Texas appellate court, found that the Divorce Decree awarded Ms. Berger a leasehold interest in the Original Wells (and therefore an interest in the Additional Wells). [Findings of Fact No. 18–19]. Importantly, in the Fourteenth Court of Appeals' decision, the court held that the Debtor's interpretation was reasonable. [Finding of Fact No. 18]. Under the circumstances, this Court concludes that the Debtor's conduct does not rise to the level of recklessness as articulated by the Fifth Circuit in *Schwager*. At least it does not rise to this level up to April 29, 2008 (i.e. the date that the jury effectively awarded Ms. Berger an interest in revenues from the Additional Wells). Once the jury awarded Ms. Berger a leasehold interest in the Original Wells and an interest in revenues from the Additional Wells, the Debtor's conduct may or may not have risen to the requisite level of recklessness. However, even if the Debtor's conduct was reckless after April 29, 2008, the trust position that the Debtor held does not rise to the level of an express or technical trust to prevent discharge through defalcation under § 523(a)(4).

---

[12] Had the Divorce Decree awarded Ms. Berger real property or leasehold interests in the Original Wells, she could have elected to participate in the Additional Wells.

**C.**     **Ms. Berger's reliance on this Court's decision in *Presto* is misplaced, as *Presto* dealt with an exception to exemption under 11 U.S.C. § 522(q)(1)(B)(ii).**

Ms. Berger argues that this Court has previously held that Tex. Fam. Code Ann. § 9.011(b) creates a fiduciary duty. [Finding of Fact No. 25]. She is correct, but her argument is misplaced. In *In re Presto*, 376 B.R. 554 (Bankr. S.D. Tex. 2007), the Official Employment-Related Issues Committee of Enron Corp. (the Committee)[13] objected to the debtor's claim of the homestead exemption. *Id.* at 563. The Committee relied in part on 11 U.S.C. § 522(q), which provides that a debtor may not exempt property exceeding $125,000.00 in value if the debtor owes a debt arising from "fraud, deceit, or manipulation in a fiduciary capacity . . . ." *Presto*, 376 B.R. at 591–92. Mr. Presto failed to remit a $12,284.00 check, which amounted to one-half of a tax refund, to his ex-wife. *Id.* at 595. The decree of divorce unambiguously required Mr. Presto to remit to his ex-wife the proceeds from any tax refunds. *Id.*

This Court concluded that Tex. Fam. Code Ann. § 9.011(b) created a fiduciary obligation on Mr. Presto's behalf. *Presto*, 376 B.R. at 593–94. However, this Court first noted the following:

> The Committee characterizes [the terms of the divorce decree] as creating an ordinary trustee-beneficiary relationship, citing case law generally holding that a trustee owes a fiduciary duty to the trust beneficiaries. A constructive trust, however, is unlike other trusts. Under Texas law, a constructive trust is not actually a trust, but rather an equitable remedy imposed by law to prevent unjust enrichment resulting from an unconscionable act. . . . The two circumstances that generally justify the imposition of a constructive trust are actual fraud and the breach of a confidential or fiduciary relationship. The breach of a pre-existing fiduciary relationship gives rise to a constructive trust; whereas, in a traditional trust, the pre-existing trust gives rise to the existence of a fiduciary duty.

*Id.* (quoting *Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 436 (5th Cir. 1994)). Further, this Court expressly found that the Family Code "created both a fiduciary obligation *and a constructive trust* between [Mr. Presto] and [his ex-wife] upon [Mr. Presto's] receipt of the tax

---

[13] Kevin Presto (Mr. Presto) was a vice-president at Enron prior to its collapse. *Presto*, 376 B.R. at 562.

refund proceeds." *Presto*, 376 B.R. at 594 (second emphasis added).  While a constructive trust and its corresponding fiduciary duty may suffice for purposes of exceptions to exemptions under 11 U.S.C. § 522(q), the fact remains that Ms. Berger is seeking an exception to discharge for defalcation under § 523(a)(4).  As discussed above, Fifth Circuit precedent is abundantly clear that a constructive trust is not sufficient for defalcation.

Further, the facts of *Presto* differ significantly from those in the case at bar.  Despite his assertions that the check to his ex-wife for her portion of the tax refund was "lost in the mail," this Court found that Mr. Presto either (a) never wrote a check; or (b) wrote the check but later decided not to mail it.  *Id.* at 595.  Further, Mr. Presto forged his ex-wife's name on both the tax return and the refund check.  *Id.* at 596.  This Court concluded that Mr. Presto intentionally concealed the tax refund where there was a duty to disclose.  *Id.* at 595.  Indeed, this Court went on to conclude that Mr. Presto's intentional concealment of the tax refund constituted common law fraud.  *Id.* at 597.

Conversely, the Debtor's conduct in the case at bar appears to have been above the board.  *E.g.* [Finding of Fact No. 4] (finding that the Debtor instructed TIE to place fifty percent (50%) of the joint interest billing and the revenue in the Original Wells in Ms. Berger's name and account before the entry of the Divorce Decree).  The Debtor's interpretation of the interests awarded in the Divorce Decree had been vindicated until 2007—fourteen years after entry of the Divorce Decree.  [Findings of Fact No. 18–19].

As the Fifth Circuit holds that § 523(a)(4) requires an express or technical trust and a *mens rea* of willful neglect, Ms. Berger's reliance on *Presto* is inapplicable to the dispute at bar.

**D.**   **Although Ms. Berger has failed to establish that the Debtor has committed defalcation while acting in a fiduciary capacity, she nevertheless is entitled to establish that the Debtor has committed embezzlement or larceny, as pleaded in her complaint.**

In her complaint, Ms. Berger avers that the Debtor "alternatively committed embezzlement or larceny." [Finding of Fact No. 24]. The Debtor's motion for summary judgment did not address these two issues. Given that on April 29, 2008, a jury made findings that effectively held that Ms. Berger should have received revenues from the Additional Wells [Finding of Fact No. 19], and given that the Parties have stipulated that the Debtor has received revenues from the Additional Wells up to the present [Finding of Fact No. 7], the Court wants the Parties to address whether, as a matter of law, the Debtor's failure to remit Ms. Berger's share of these particular revenues to her constitutes either larceny or embezzlement. *See e.g. In re Davenport*, 353 B.R. 150, 199 (Bankr. S.D. Tex. 2006) (discussing the elements that need to be met to establish embezzlement or larceny under § 523 (a)(4). Therefore, the Court will set a status conference to discuss a schedule for adjudicating these remaining points.

## IV. CONCLUSION

Ms. Berger's claim against the Debtor does not fall within the category of nondischargeable debts arising from defalcation for two separate and distinct reasons. First, the trust created by Tex. Fam. Code § 9.011(b) is a constructive trust, as opposed to an express or technical trust as required by clear Fifth Circuit precedent; and a constructive trust precludes any recovery under defalcation under § 523 (a)(4). Second, the Debtor's conduct—at least up to April 29, 2008 (*i.e.* the date that the jury effectively awarded Ms. Berger an interest in revenues from the Additional Wells)—did not rise to the level of recklessness. Once the jury awarded Ms. Berger a leasehold interest in the Original Wells and an interest in revenues from the Additional Wells, the Debtor's conduct may or may not have risen to the requisite level of recklessness. However, even if the Debtor's conduct was reckless after April 29, 2008, the trust position that

the Debtor held does not rise to the level of an express or technical trust to prevent discharge through defalcation under § 523(a)(4).

Whether the Debtor committed larceny or embezzlement after April 29, 2008—*i.e.* after he knew that the jury had effectively awarded Ms. Berger an interest in revenues from the Additional Wells—are issues left for another day.

An order consistent with this Opinion will be entered on the docket simultaneously with the entry on the docket of this Opinion.

Signed on this 6th day of July, 2010.

Jeff Bohm
United States Bankruptcy Judge